# In the United States Court of Federal Claims

No. 15-75 C
Filed: September 2, 2015[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ADVANCED CONCEPTS ENTERPRISES, INC., | Administrative Record, RCFC 52.1 |
| Plaintiff, | Bid Protest; Federal Acquisition Regulations ("FAR"), |
| v. | 15.306 (Clarifications), 15.404-1 (Unbalanced Pricing), 16.201 (Firm-Fixed Contracts); |
| THE UNITED STATES, | 52.215-1 (Instructions To Offerors) Preliminary Injunction, |
| Defendant. | RCFC 65. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Kevin J. Maynard**, Wiley Rein, LLP, Washington, D.C., Counsel for Plaintiff.

**Devin A. Wolak**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

## I.     RELEVANT FACTUAL BACKGROUND.[2]

On November 22, 2013, the United States Department of the Air Force ("Air Force") issued a Request for Proposals ("RFP") for Solicitation No. FA4890-13-R-0122 ("Solicitation"). AR Tab 8, at 290. The Solicitation requested bids for full-spectrum Mission Crew Training ("MCT") services for the Boeing E-3 Sentry aircraft at Tinker Air Force Base in Oklahoma City, Oklahoma. AR Tab 11, at 774. The performance work statement ("PWS"), included in the RFP, specified that performance would include "courseware development, academic instruction, Aircrew Training Device (ATD) instruction, simulator operator support, scenario development, mission crew ATD

---

[1] On August 26, 2015, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. The court has incorporated some of these comments and corrected or clarified certain portions herein.

[2] The facts discussed herein were derived from the February 6, 2015 Administrative Record ("AR Tabs 1–61, at 1–4005") and the August 20, 2015 oral argument ("8/20/15 TR 1–78").

event scheduling, and support functions." AR Tab 11, at 774. The contractor would be responsible for teaching Air Force personnel to operate the E-3 aircraft both by classroom instruction and flight simulators. AR Tab 11, at 774.

The RFP specified that the contractor would provide these services in accordance with the PWS. AR Tab 28, at 2239–89. In turn, the PWS set forth technical performance criteria and provided historical workload estimates for the required tasks. AR Tab 11, at 774–83, 812–17. Offerors were expected to use these estimates to prepare analyses required for their technical submissions serve as a basis for pricing submissions. AR Tab 11, at 812–15. As part of the technical submission, offerors also were required to prepare a manning workload analysis that described "the proposed labor categories for both full time and any part time positions with full explanation of the offeror[']s methodology." AR Tab 28, at 2416. An offeror's pricing also was required to cover estimated work levels, plus potential work that could be necessary, if performance required "surge" or "reteach" efforts. AR Tab 11, at 812–15.

In addition, the PWS specified qualification criteria for all personnel who would be performing work under the contract. AR Tab 11, 798–801. For example, the proposed program manager must possess, among other things, "[f]ive years['] experience as project/program manager for a program[] of the equivalent size and complexity as the E-3 weapons system." AR Tab 11, at 799.

And, the PWS described general requirements for E-3 mission simulator operations support. AR Tab 11, at 777–78. For example, the PWS provided that each of the simulators would operate "up to" sixteen hours per day, although simulator staff "are not required for the whole [sixteen] hours but must be available during these hours." AR Tab 11, at 778, 789. The PWS also specified that the personnel responsible for simulator operations support are "exercise directors" and "simulator operators," so individual simulator operators must be qualified to work in any of the three classes of simulators. AR Tab 11, at 804–05, 816. The specific staffing mix of exercise directors and simulator operators, however, was left to the contractor, but it was required to be based upon the PWS estimate. AR Tab 11, at 816.

The contract price was firm-fixed.[3] AR Tab 28, at 2368. Pricing was allocated among six firm contract line item numbers ("CLINs"): Contract Academic Training; Courseware

---

[3] Federal Acquisition Regulation ("FAR") 16.201(a) provides:

Fixed-price types of contracts provide for a firm price or, in appropriate cases, an adjustable price. Fixed-price contracts providing for an adjustable price may include a ceiling price, a target price (including target cost), or both. Unless otherwise specified in the contract, the ceiling price or target price is subject to adjustment only by operation of contract clauses providing for equitable adjustment or other revision of the contract price under stated circumstances. The contracting officer shall use firm-fixed-price or fixed-price with economic price adjustment contracts when acquiring commercial items, except as provided in 12.207(b).

48 C.F.R. § 16.201(a).

Development; Registrar Support; Scheduling; Simulator Operation Support; and Generation of Simulator Events.  AR Tab 28, at 2240–45.

The Air Force also was required to use a lowest price technically acceptable ("LPTA") source selection process that evaluated three factors: Technical[4]; Past Performance; and Price.[5]

_____

[4] The technical evaluation factor contained four sub-factors: (1) management approach and manning workload analysis; (2) training management and approach; (3) courseware development approach, instructional systems development management plan ("ISDMP") and quality control plan ("QCP"); and (4) transition plan and contractor-furnished equipment.  AR Tab 28, at 2429.

[5] The price evaluation factor contained four sub-factors: (1) "[p]rice will be evaluated using techniques established in FAR 15.404-1 to ensure the Government receives a fair, reasonable and balanced price"; (2) analysis "to identify any potential unbalanced pricing," in accordance with FAR 15.404-1(g); (3) "[a]n exceptionally or unrealistically low offer may pose an unacceptable risk to the Government and may be a reason to reject an offeror's proposal"; and (4) the general mathematical price-analysis methodology: add all pricing for all periods, plus fifty percent of the pricing for the fourth option period as a proxy for the potential end-of-contract emergency extension available under FAR 52.217-8.  AR Tab 28, at 2432–35.

FAR 15.404-1 regulates proposal analysis techniques and provides:

(1) Unbalanced pricing may increase performance risk and could result in payment of unreasonably high prices. Unbalanced pricing exists when, despite an acceptable total evaluated price, the price of one or more contract line items is significantly over or understated as indicated by the application of cost or price analysis techniques. The greatest risks associated with unbalanced pricing occur when—

(i) Startup work, mobilization, first articles, or first article testing are separate line items;

(ii) Base quantities and option quantities are separate line items; or

(ii) The evaluated price is the aggregate of estimated quantities to be ordered under separate line items of an indefinite-delivery contract.

(2) All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced.  If cost or price analysis techniques indicate that an offer is unbalanced, the contracting officer shall—

(i) Consider the risks to the Government associated with the unbalanced pricing in determining the competitive range and in making the source selection decision; and

AR Tab 28, at 2429.   Ratings for technical proposals would be rated, either as "acceptable" or "unacceptable," reflecting "which offeror's proposal meets or does not meet the minimum performance or capability requirements."  AR Tab 28, at 2432.  In short, the "focus is on the ability of the offeror[']s proposal to meet the minimum requirements of the PWS."  AR Tab 28, at 2432.

In response to the March 13, 2013 RFP, six offerors submitted proposals, but only Advanced Concepts Enterprises, Inc. ("ACE"), [REDACTED], and Sonoran Technology and Professional Services, LLC ("Sonoran") submitted technically "acceptable" proposals.  AR Tab 51, at 3369–70.  Sonoran submitted the lowest proposed price between the two, and, on July 1, 2014, was awarded the contract.  AR Tab 51, at 3372.

On July 1, 2014, the Air Force notified ACE that the contract was awarded to Sonoran.  AR Tab 24, at 1604.  On July 10, 2014, ACE filed a protest with the Government Accountability Office ("GAO"),[6] alleging that the Air Force misevaluated the proposals and that "Sonoran's proposed price was unreasonable, unrealistic, and even unfeasible, because it was too low to be both technically acceptable and to pay the required wages as defined by the [CBA]."  AR Tab 25, at 1852.

In response, the Air Force took corrective action by re-evaluating the proposals and on August 13, 2014, the GAO dismissed ACE's protest.  AR Tab 29, at 2436–37.  Independently, during the period from July 15, 2014 to August 14, 2014, the Source Selection Evaluation Board ("SSEB") re-evaluated all six proposals, and concluded that Sonoran's proposal met the minimum requirements of the PWS and that each offeror's pricing complied with the CBA.  AR Tab 31, 2509–10; AR Tab 34, at 2533–39; AR Tab 54, at 3549, 3559.  Consequently, the Air Force re-awarded the contract to Sonoran.  AR Tab 38, at 2805–08.

On October 21, 2014, the Air Force notified ACE that it completed a re-evaluation, but selected Sonoran for the award.  AR Tab 38, at 2805–06.  On November 4, 2014, ACE filed another protest with the GAO.  AR Tab 42, at 2859–81.  On December 4, 2014, the Air Force filed an Agency Report indicating that Sonoran, [REDACTED], and ACE submitted technically acceptable offers.  AR Tab 54, at 3610.  The Agency Report stated that Sonoran's proposal had an overall price of $28,609,748.50, [REDACTED]'s proposal had an overall price of $[REDACTED], and ACE's proposal had an overall price of $[REDACTED].  AR Tab 54, at 3610.  Therefore, on January 22, 2015, the GAO dismissed ACEs' second protest for lack of standing.  AR Tab 49, at 3294–96.

---

(ii) Consider whether award of the contract will result in paying unreasonably high prices for contract performance.

(3) An offer may be rejected if the contracting officer determines that the lack of balance poses an unacceptable risk to the Government.

48 C.F.R. § 15.401-1(g).

[6] [REDACTED].

## II.      RELEVANT PROCEDURAL HISTORY.

On January 26, 2015, ACE ("Plaintiff") filed a Complaint ("Compl."), a Motion For Preliminary Injunction, and a Motion For Protective Order, in the United States Court of Federal Claims. That same day, the court granted Plaintiff's Motion For Protective Order, denied Plaintiff's Motion For Preliminary Injunction, and entered a Scheduling Order.

On March 6, 2015, Plaintiff filed a Motion For Judgment On The Administrative Record ("Pl. Mot."). On April 20, 2015, the Government filed a Response And Cross-Motion For Judgment On The Administrative Record ("Gov't Mot."). On May 1, 2015, the Plaintiff filed a Reply ("Pl. Reply"). On May 14, 2015, the Government filed a Reply ("Gov't Reply").

On August 20, 2015, the court held oral argument on the parties' pending motions.

## III.     DISCUSSION.

### A.      Jurisdiction.

The United States Court of Federal Claims is required to make a threshold determination regarding jurisdiction. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[A]t the outset [the court] shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course.").

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

The January 26, 2015 Complaint alleges that: (1) "the Air Force failed to evaluate price realism as expressly required by the Solicitation"; (2) "the Agency's methodology during its cursory review of prices was arbitrary and capricious and inconsistent with the terms of the Solicitation"; (3) "the Agency improperly relaxed material Solicitation requirements by allowing [Sonoran] to exclude" required tasks and workload from its proposed staffing and price; (4) "the Agency violated its fundamental obligations under the FAR to ensure that all offerors receive 'impartial, pair, and equitable treatment,' and to make an award based solely on the factors set forth in the solicitation"; (5) "the Agency acted unreasonably by failing to engage in meaningful discussion with ACE[] to inform ACE[] of the Agency's actual requirements"; and (6) "the Agency's evaluation of [Sonoran's] proposed personnel was unreasonable and contrary to the terms of the Solicitation[.]" Compl. ¶¶ 4–10.

Since the January 26, 2015 Complaint alleges sufficient facts of a money-mandating claim under 28 U.S.C. § 1491(b)(1), and alleges violations of law or regulations "in connection with" the Solicitation, the United States Court of Federal Claims has jurisdiction to adjudicate the claims alleged in the May 26, 2015 Complaint.

## B.    Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) ("To have standing to bring a bid protest in the Court of Federal Claims, a plaintiff must be an "'interested party.'"). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party" under the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protestor is an "interested party:" the protestor must show that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Sols., Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citations omitted). In addition, to establish "interested party" status, a protestor must show the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (citations omitted); *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. Importantly, a proper standing inquiry must not conflate the requirement of "direct economic interest" with prejudicial error. *Id.* at 1380 (Examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful.").

In this case, Plaintiff submitted a proposal in response to the Solicitation. AR Tab 51, 3363–64. As an "actual bidder," Plaintiff therefore satisfies the first element of the "interested party" test. *See Distrib. Sols.*, 539 F.3d at 1344.

Plaintiff also satisfied the second standing element, *i.e.*, that it had a direct economic interest in the procurement or proposed procurement, because the Air Force rated Plaintiff's proposal as technically acceptable. AR Tab 51, at 3369–70. *See Distrib. Sols.*, 539 F.3d at 1344.

As to prejudice, if the Air Force failed to comply with the Solicitation or the FAR, that would violate the law and prejudice Plaintiff, because "there is a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005); *see also Labatt*, 577 F.3d at 1378 (same).

For these reasons, the court has determined that Plaintiff has standing to seek an adjudication of its January 26, 2015 bid protest Complaint.

### C.    Standard of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *Weeks Marine*, *Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) (same).

If a bid protest is based on a regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (citations omitted).

If an award decision is challenged because it was made without a rational basis, the trial court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (citations omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke highly deferential rational basis review . . . . Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (citations omitted).

In the alternative, if an award decision is challenged on the grounds that an agency acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances." *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983). "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.- Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In this case, the parties filed Cross-Motions For Judgment On The Administrative Record, requiring the court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC

52.1[7]; *see also Bannum*, 404 F.3d at 1356 ("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record.").  The existence of a material issue of fact does not prohibit the court from granting a motion for judgment on the administrative record, even if the court has not conducted an evidentiary proceeding.  *See Bannum*, 404 F.3d at 1357 (authorizing the court to make "factual findings under RCFC [52.1][8] from the [limited] record evidence as if it were conducting a trial on the record").

> **D.** **The Government's Alleged Errors.**
>
> **1.** **Whether The Government Conducted Proper Price Realism And Balance Analyses.**
>
> **a.** **Plaintiff's Argument.**

Plaintiff argues that the Air Force violated the law by failing to perform price realism and balance[9] analyses required by the Solicitation's evaluation criteria.  Pl. Mot. at 21–23; *see also* 8/20/15 TR 5 (Q: "[W]here are the violations of law?"  A: "[T]he failure to evaluate price realism[.]").  Although the RFP called for LPTA source selection, it warned that "[a]n exceptionally or unrealistically low offer may pose an unacceptable risk to the Government and may be a reason to reject an offeror's proposal."  AR Tab 28, at 2434.  "By informing offerors that

---

[7] RCFC 52.1, in relevant part, provides:

(c) Motions for Judgment on the Administrative Record.

> (1) *Initial Motion*.  Absent an order by the court establishing a different procedure, a party may move for partial or other judgment on the administrative record and must include in its motion or supporting memorandum a statement of facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court.
>
> (2) *Response*.  A party opposing a motion based on the administrative record must include in any response a counterstatement of facts that similarly draws upon and cites to the administrative record.

RCFC 52.1(c)(1)–(2).

[8] In 2006, RCFC 56.1 was repealed and replaced with RCFC 52.1, to conform to the United States Court of Appeals for the Federal Circuit's decision in *Bannum*, 404 F.3d at 1354 (holding that the court should "make factual findings from the record evidence as if it were conducting a trial on the record").  *See* RCFC 52.1, 2006 Rules Committee Notes.  "Summary judgment standards are not pertinent to judicial review upon the [A]dministrative [R]ecord."  RCFC 52.1, 2006 Rules Committee Notes.

[9] "The [CO's] obligation to review bids fairly and impartially requires her to treat offerors equally and evaluate proposals without prejudice."  *OSG Prod. Tankers LLC v. United States*, 82 Fed. Cl. 570, 575 (2008).  This includes testing the offers for unbalanced pricing.  *Id.*

the [Air Force] could reject any proposal that was considered 'exceptionally or unrealistically low,' the [Air Force] committed itself to preforming an evaluation of price realism." Pl. Mot. at 21 (citing *Logistics 2020, Inc.*, B-408543, Nov. 6, 2013 CPD ¶ 258 ("Given the solicitation's express statement that proposals would be evaluated to determine if prices were 'unrealistically high or low,' we see no basis for any conclusion other than that the agency committed itself to a review of price realism.")).

The Air Force, however, did not conduct the required price realism analysis. Pl. Mot. at 22. "Instead, the evaluators arbitrarily concluded that 'price realism was not required' based on the unsupported conclusion that '[REDACTED].'" Pl. Mot. at 22 (quoting AR Tab 54, at 3559).

The Air Force also failed to determine whether prices were materially "unbalanced." Pl. Mot. at 24. The Administrative Record reflects that "[e]ach offeror's pricing was evaluated for reasonableness and affordability to ensure the [G]overnment received a fair, reasonable, and balanced price." Pl. Mot. at 24 (quoting AR Tab 54, at 3559). "[A]n evaluation of 'reasonableness and affordability' (*i.e.*, whether prices were too high) is fundamentally different from an evaluation of either balance (*i.e.*, whether prices are understated) or realism (*i.e.*, whether prices are too low)." Pl. Mot. at 24. There is no evidence in the Administrative Record that the Air Force examined whether offerors' proposed prices either were "realistic" or "balanced." Pl. Mot. at 24. If the Air Force did so using the Independent Government Cost Estimate ("IGCE"), it would have been aware that Sonoran's price was significantly lower than the IGCE for nearly every line item and Sonoran's and [REDACTED]'s proposed prices for individual line items were below cost and therefore unbalanced. Pl. Mot. at 23–24. The Air Force's failure to conduct the requisite price realism and balance analyses was "contrary to the terms of the Solicitation, and was therefore unreasonable, arbitrary and capricious." Pl. Mot. 25.

### b. The Government's Response.

The Government responds that the RFP required the Air Force to perform price realism and balance analyses and the Air Force did so. Gov't Mot. at 20, 24. When reviewing an agency's price realism analysis, the United States Court of Appeals for the Federal Circuit has stated that "the [c]ourt is 'not to introduce new requirements outside the scope of the RFP' through judicial review." Gov't Mot. at 20 (quoting *Ala. Aircraft*, 586 F.3d at 1376); Gov't Mot. at 19 (citing *Info. Scis. Corp. v. United States*, 73 Fed. Cl. 70, 101 (2006) ("When conducting a 'price realism analysis,' substantial discretion has been given to the contracting agency.")).

"[Plaintiff's] assertion that the Air Force did not perform a price realism analysis is simply incorrect." Gov't Mot. at 23. The Air Force conducted a price realism analysis in the corrective action as a result of Plaintiff's first GAO protest, and it performed an in-depth re-examination of all the proposals to determine whether the proposed pricing and staffing were sufficient. Gov't Mot. at 20–21. That analysis is thoroughly documented. AR Tab 31, at 2509–10 (undated Corrective Action Technical Evaluation for Sonoran); AR Tab 34, at 2533–39 (3/4/14 Initial Price Clarification for Sonoran); AR Tab 61, at 3999 (4/3/15 Corrective Action Memorandum). In sum, the SSEB identified all relevant RFP and PWS provisions, reviewed and described the relevant portions of Sonoran's proposal that addressed those provisions, and concluded that Sonoran's technical approach met the minimum RFP requirements. Gov't Mot. at 21–22. The SSEB also concluded that Sonoran's ability to [REDACTED] reasonably would lead to the staffing

flexibilities and efficiencies promised in Sonoran's proposal. Gov't Mot. at 22. And, pricing for all offerors would cover the wages and fringe benefits required under the CBA. Gov't Mot. at 22.

"At the end of this two-step price realism analysis, Sonoran remained the lowest-priced technically acceptable offeror, and, therefore, the Air Force reawarded it the contract." Gov't Mot. 23. Although the Air Force concluded that "price realism was not required," in the end, it performed a price realism analysis. Gov't Reply at 9.

The Administrative Record reflects the Air Force also considered price balance. Gov't Mot. at 24–25. The RFP's pricing evaluation criteria provided that the Air Force would evaluate price balance in two steps: (1) "using techniques established in FAR 15.404-1 to ensure the Government receives a fair, reasonable, and balanced price"; and (2) "identify[ing] any potential unbalanced pricing," in accordance with FAR 15.404-1(g). Gov't Mot. at 24 (citing AR Tab 28, at 2434).

The Air Force's October 16, 2014 Corrective Action Report also states that the Air Force evaluated the each offer for balance:

[REDACTED]

AR Tab 54, at 3558–59 (10/16/14 Corrective Action Report).

As such, the October 16, 2014 Corrective Action Report demonstrated that each technically acceptable offeror's pricing was compared with the IGCE on a CLIN-by-CLIN basis, and was evaluated against the pricing of other offerors, with similar contracts, and the CBA. AR Tab 54, at 3569–70, 3583–84, 3591. After completing this analysis, the CO found that the pricing from the three technically acceptable offerors posed no risk to the Air Force. Gov't Mot. at 25 (citing AR Tab 59, at 3830–32).

### c.   The Court's Resolution.

The parties agree that the Government was required to perform both price realism and balance analyses. *Compare* Pl. Mot. at 21–23, *with* Gov't Mot. at 20, 24. The court addresses each in turn.

### i.    Price Realism Analysis.

A price realism analysis requires:

evaluating specific elements of each offeror's proposed cost estimate to determine whether the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance and materials described in the offeror's technical proposal.

48 C.F.R. § 15.404-1(d)(1).

When an agency chooses to conduct a price realism analysis for a fixed-price contract, the results "may be used in performance risk assessments and responsibility determinations. However, proposals shall be evaluated using the

> criteria in the solicitation, and the offered prices shall not be adjusted as a result of the analysis."  [48 C.F.R.] § 15.404-1(d)(3). . . .  [T]he purpose of price realism analysis is to ensure that an offeror understands the solicitation requirements and actually can perform those requirements . . . in the manner that it proposes[.]"

*Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 356 (2009) (quoting *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007)).

When a price realism analysis is required, "[t]he FAR does not mandate any particular method of proceeding, and 'the nature and extent of a price realism analysis, as well as an assessment of the potential risk associated with a proposed price, are generally within the sound exercise of the agency's discretion.'"  *Afghan Am. Servs.*, 90 Fed. Cl. at 357 (quoting *Pemco Aeroplex, Inc.*, B-310372.3, CPD ¶ 126, 2008 WL 2684841, at *5 (Comp. Gen. June 13, 2008)). "The agency's 'discretion is even more pronounced when the Solicitation is silent regarding the methodology to be used in conducting a "price realism analysis[.]"'  *Id.* at 358 (quoting *Info. Scis. Corp.*, 73 Fed. Cl. at 102).

> When the agency provides for "a price realism analysis in the solicitation for such purposes as measuring an offeror's understanding of the solicitation's requirements and for assessing the risk inherent in an offeror's proposal," an appropriate analysis can be whether the price is "reasonable and realistic," and ways to accomplish the testing include "comparison of prices received with each other; comparison of previously proposed prices for the same or similar items; comparison with the independent [G]overnment estimate; and analysis of pricing information provided by the offeror."

*Id.* (quoting *Burns & Roe Servs. Corp.*, B-296355, CPD ¶ 150, 2005 WL 2037620, at *5 (Comp. Gen. July 27, 2005)).

Put another way, an agency's price-realism analysis lacks a rational basis if the contracting agency made "irrational assumptions or critical miscalculations."  *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000).

In this case, Plaintiff argues that the Air Force "never undertook any of the techniques commonly used to evaluate price realism . . . .  In fact, the evaluators in this case irrationally decided *not* to conduct a comparison between the offerors' proposed prices and the Agency's own IGCE, which is often used to evaluate price realism[.]"  Pl. Mot. at 23.  But, the Government is not bound to use "techniques commonly used."  Instead, as the GAO has recognized, "the nature and extent of a price realism analysis . . . are generally within the sound exercise of the agency's discretion."  *Pemco Aeroplex*, 2008 WL 2684841, at *5.

In its March 4, 2014 Initial Price Clarification, the Air Force compared Sonoran's labor costs to its proposed price.  AR Tab 34, at 2535–39.  Later, in an undated[10] corrective action technical evaluation, the Government concluded that "Sonoran clearly outlined in their technical proposal how they intended to meet the minimum PWS requirements of the 15 courses," including

---

[10] The Government's index to the Administrative Record indicates that the documents in Tab 31, including the Technical Team Member Rating Worksheet, range from July 15, 2014 to August 26, 2014.

[REDACTED] not only to gain significant efficiencies, but also to provide flexibility[.]" AR Tab 31, at 2509. An April 3, 2015 Memorandum also discusses the CO's corrective action analysis that "mathematically addresses [Plaintiff's] assertion that the previous analysis did not account for health benefits, vacation, holidays, and paid time off[.]" AR Tab 61, at 3999. The CO contended that "[t]he previous analysis was not flawed" with respect to calculating premium pay, because "that level of precision is unreasonable" and not required by the RFP. AR Tab 61, at 3999. Nevertheless, she concluded that, "[u]sing a very conservative estimate" of premium pay costs, "Sonoran's total wage and fringe benefit cost for the base period would be \$[REDACTED] lower than its proposed pricing[.]" AR Tab 61, at 3999. Because the Air Force's price realism concluded that Sonoran's pricing was not unrealistically low and the "PWS afforded offerors the flexibility to propose manning to [the required] tasks as they [saw] fit," the CO affirmed the decision award. AR Tab 61, at 3999.

Although these actions are inconsistent with the Air Force's October 16, 2014 conclusion that "price realism was not required," the entire text of relevant paragraph provides:

> *None of the three technically and past performance acceptable offerors appeared exceptionally or unrealistically low*. Therefore, none of the three technically and past performance acceptable offerors were requested to address any disparity. [REDACTED], *as a result of this pricing analysis*, price realism was not required.

AR Tab 54, at 3559 (emphases added).

That text, together with the Air Force's documented actions, demonstrate that regardless of its conclusion that "price realism was not required," the Air Force in fact conducted a price realism analysis. Specifically, the Administrative Record evidences that the Air Force "evaluat[ed] specific elements of [Sonoran's] proposed cost estimate" and determined that "the estimated proposed cost elements are realistic for the work to be performed; reflect a clear understanding of the requirements; and are consistent with the unique methods of performance[.]" 48 C.F.R. § 15.404-1(d)(1).

For these reasons, the court has determined that the Air Force properly conducted a price realism analysis in this case.

## ii.    Balance Analysis.

The Solicitation and FAR § 15.404-1(g)(2) require that the Air Force analyze individual line item prices to determine whether those prices were balanced. AR Tab 28, at 2434; 48 C.F.R. § 15.404-1(g)(2) ("All offers with separately priced line items or subline items shall be analyzed to determine if the prices are unbalanced.").

"The [CO's] obligation to review bids fairly and impartially requires her to treat offerors equally and evaluate proposals without prejudice." *OSG Prod. Tankers LLC v. United States*, 82 Fed. Cl. 570, 575 (2008). This includes testing the offers for unbalanced pricing. *Id.*

> Unbalanced pricing exists when, "despite an acceptable total evaluated price, the price of one or more contract line items is significantly overstated or understated as indicated by the application of cost or price analysis techniques." [48 C.F.R. § ] 52.215-1(f)(8). Upon determining that an offer contains unbalanced pricing, a [CO] must "demonstrate whether award on the basis of an apparently unbalanced

offer would result in paying unreasonably high prices" or present unacceptable risks to the Government. *CCL Serv. Corp. v. United States*, 48 Fed. Cl. 113, 122 (2000). Thus, a [CO] may reject a proposal if he determines that "the lack of balance poses an unacceptable risk to the Government." [48 C.F.R. §] 52.215-1(f)(8).

*Ceres Envtl. Servs., Inc. v. United States*, 97 Fed. Cl. 277, 308 (2011) (some citations omitted).

"A [CO] may reject a bid if she considers it front-loaded or a high risk for the Government. However, if the [CO] determines that the proposed prices and the risk are acceptable, she may accept the bid as priced." *OSG Prod.*, 82 Fed. Cl. at 575 (citations omitted).

Even if the Government fails to analyze every line item for balance, a plaintiff still must show that it was prejudiced by that error. *See Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378. In addition, the unbalance must be material, not merely mathematical. *See Andersen Consulting v. United States*, 959 F.2d 929, 933 (Fed. Cir. 1992) ("[M]athematical imbalance is insufficient to disqualify a bid; the bid must be materially imbalanced to be rejected."). A material imbalance "occurs if an award fails to represent the lowest ultimate cost to the Government or the imbalance is such that it will adversely affect the integrity of the competitive bidding system." *SMS Data Prods. Grp., Inc. v. United States*, 900 F.2d 1553, 1557 (Fed. Cir. 1990). In sum, a plaintiff must show that: the Government did not perform a balance analysis; the plaintiff was prejudiced by the error; and the unbalance was material to the awardee's proposal.

In this case, the Government's October 16, 2014 Corrective Action Report states that it:

conducted its evaluation of all proposals in accordance with RFP Section 7. A price analysis was conducted using the methods within FAR 15.404-1, Proposal Analysis Techniques. ENs were documented for issues identified during the evaluation. Also, the pricing data was reviewed by the AMIC Price Analyst and no discrepancies were noted. Each offeror's pricing was evaluated for reasonableness and affordability to ensure the [G]overnment received a fair, reasonable and balanced price.

AR Tab 54, at 3558–59.

The Government also compared CLINs with the IGCE, even though the IGCE was built from data based on a former contract that, unlike this contract, was not performance-based. AR Tab 54, at 3557, 3569–70. Although the Government responds that it "review[ed] the CLINs closely," even correcting some typographical errors, it stopped short of asserting that it fully complied with FAR 15.404-1(g)(2). Gov't Reply at 5–6. In fact, the CO stated that "[REDACTED]." AR Tab 61, at 3999. In addition, the Administrative Record does not show that the Air Force performed a CLIN-by-CLIN balance analysis, so the "court cannot assume that an analysis was performed where the record indicates otherwise." *Al Ghanim*, 56 Fed. Cl. at 514.

But, Plaintiff has not demonstrated that a "material imbalance" occurred, because it has not shown that the award "fail[ed] to represent the lowest ultimate cost to the Government or [that] the imbalance [was] such that it [] adversely affect[ed] the integrity of the bidding system." *SMS Data*, 900 F.2d at 1557. Neither the RFP, PWS, nor CBA supports Plaintiff's contentions that Sonoran proposed certain CLINs "below cost" or based on an *ad hoc* cost computation. In the

court's judgment, the Government's analysis of CLIN totals instead of a CLIN-by-CLIN analysis did not "adversely affect the integrity of the bidding system." *Id.* Moreover, the FAR provides that the CO "*may* reject" an unbalanced proposal. 48 C.F.R. § 52.215-1(f)(8). As such, the CO was not required to reject Sonoran's proposal, even if it found an imbalance.

Finally, Plaintiff has not demonstrated prejudice, because "but for the error, it would [not] have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378; *see also Matter of DynCorp Int'l LLC*, B-411465, 2015 WL 4979694, at *12 (Comp. Gen. Aug. 4, 2015) ("In sum, although we find that the agency's evaluation here contained significant flaws, we find no basis to sustain [the] protest because [the protestor] has failed to establish that, but for the agency's evaluation errors, it would have had a substantial chance of receiving the award."). As discussed herein, even if the Air Force had performed the required pricing balance analysis, it properly concluded that Sonoran's proposal was significantly less expensive. Thus, Plaintiff did not have a "substantial chance of securing the contract." *Id.*

For these reasons, the court has determined that the Government's failure to perform a pricing balance analysis did not prejudice Plaintiff, thereby implicating Plaintiff's standing.

### 2.   Whether The Government's Price Review Methodology Was Arbitrary And Capricious.

#### a.   Plaintiff's Argument.

Plaintiff argues that the Air Force's price review methodology was arbitrary and capricious for three reasons: (1) the pricing team did not make an independent assessment of each offeror's staffing mix; (2) the pricing team irrationally limited its mathematical pricing analysis to productive hours rather than total annual hours; and (3) the pricing team did not account for premium pay and health benefits due under the CBA. Pl. Mot. at 25–26.

The Air Force's price evaluation simply assumed technical acceptability at face value without any independent analysis or meaningful assessment whether the offerors' proposed prices were realistic for the work to be performed. Pl. Mot. at 25 (citing *Comput. Sci. Corp.*, B-408694.7, CPD ¶ 331, Nov. 3, 2014 (sustaining protest of cost realism evaluation where the "cost/price team never independently analyzed whether the labor hours were realistic[, because] the proposed hours were considered realistic where the proposals had been found technically acceptable")).

In addition, the Air Force's price analysis "arbitrarily focused only on the 'productive hours' (*i.e.,* the hours spent performing work called for in the PWS), but failed to account for the total number of hours that offerors would actually pay their employees each year under the CBA, based on required vacation and paid time off." Pl. Mot. at 26. Focusing only on "productive hours" led the Agency to underestimate the offerors' labor cost and overestimate the amount of "mark up" that offerors would have left over to cover their other costs. Pl. Mot. at 26. As such, "[t]his evaluation was patently irrational and unreasonable." Pl. Mot. at 27 (citing *Afghan Am. Army Servs.*, 90 Fed. Cl. at 359 (determining that a price realism analysis based on "irrational assumptions or critical miscalculations" was arbitrary and capricious)).

The Air Force's evaluation also failed to take into account certain CBA benefits, including the requirements to pay a $1.00 per hour premium to employees who are "multi-qualified" in

different tasks, a 5% premium to employees who acted as "leads,"[11] and health benefits under the employees' current health plan.  Pl. Mot. at 26.

The Air Force's corrective action also did not adequately address the issues within its price-review methodology.  Pl. Reply at 5.  "[I]n attempting to remedy its previous errors, the [Air Force] introduced a number of additional 'irrational assumptions or crucial miscalculations[.]'"  Pl. Reply at 5.  "[I]nstead of correcting the errors in its previous price analysis, the [Air Force's] latest corrective action . . . produced a misleading picture of the 'markup' that [Sonoran] would have available to cover the costs of performing the work—including the cost of performing the various 'no cost' and 'at risk' services identified in [Sonoran's] proposal, as well as the other 'unknown' costs of performance."  Pl. Reply at 12.

In sum, if the Air Force performed a reasonable evaluation, it would have noticed that Sonoran's offer was unrealistic and its proposed CLIN prices were understated.  Pl. Mot. at 26. As such, its price analysis was unreasonable, arbitrary and capricious, and contrary to the terms of the solicitation.  Pl. Mot. at 28.

### b.    The Government's Argument.

The Government responds that the Air Force's pricing team was not required to assess each offeror's staffing mix independently.  Gov't Mot. at 26.  "There is no rule requiring a team of pricing evaluators to second-guess the conclusion of the team of technical evaluators, especially on an issue that is a technical aspect of the work."  Gov't Mot. at 26.

Further, the Air Force took total annual hours worked and CBA-required premium pay and health benefits into account in its corrective action following Plaintiff's first GAO protest.  Gov't Mot. at 27–28.  Contrary to Plaintiff's contention, the corrective action did not contain "irrational assumptions or crucial mistakes," because the Air Force reasonably used the information provided by ACE in reviewing its proposal.  Gov't Reply at 2–5.

### c.    The Court's Resolution.

To overturn an award decision as arbitrary and capricious, the court must determine that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.  Moreover, the court is "not to introduce new requirements outside the scope of the RFP."  *Ala. Aircraft*, 586 F.3d at 1376.

The Administrative Record in this case demonstrates that the Air Force considered the evidence, provided a rational explanation for using the "fringe rate" published in the RFP, and reasonably determined that Sonoran's proposal did not pose an unacceptable risk to the

---

[11] "The decision to create a lead position and the appointment of an employee to a lead shall be at the sole discretion of the Company . . . . [and] shall be paid a premium of five (5) percent per hour above his/her base rate."  AR Tab 35, at 2579.

Government.  AR Tab 61, at 3998; AR Tab 54, at 3559.  As such, the Air Force's decision was not arbitrary and capricious.

For these reasons, the court has determined that the Air Force's methodology and price evaluation was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 3.    Whether The Government Materially Altered The Solicitation Requirements.

#### a.    Plaintiff's Argument.

Plaintiff argues that the Air Force "failed to meaningfully consider the numerous instances in which [Sonoran's] proposed manning and proposed fixed prices failed to account for all of the required workload and tasks that were mandated in the RFP."  Pl. Mot. at 28.

The RFP included detailed estimates of the historical workload for each required task in the PWS.  Pl. Mot. at 28.  Using this data, offerors were required to create a detailed "Manning Workload Analysis" showing the number of labor hours needed to perform each task.  Pl. Mot. at 28.  Offerors were required to propose a firm-fixed price for each task.  Pl. Mot. at 29 (citing AR Tab 28, at 2416).  Based on this information, the Air Force was required to "evaluate whether the offerors' technical proposals included '[s]ufficient labor categories, skill level, number of personnel for both full and part time positions to meet PWS requirements[,]' and whether the offerors' proposed fixed prices were realistic for the work to be performed."  Pl. Mot. at 29 (citing AR Tab 28, at 2433–35).

Despite these requirements, Sonoran failed to include sufficient labor hours or prices for numerous aspects of the PWS, including: (1) the "5% Reteach Factor"; (2) the "15% CAT 'Surge' Requirement"; (3) the "10% CWD 'Surge' Requirement"; (4) the "Generation of Mission Simulator Events"; (5) the "Annual 'Switch Action Training' Course"; and (6) "Simulator Operation Support."  Pl. Mot. at 29–36.  This failure resulted in Sonoran's proposal being $9.4 million lower than it would have been otherwise.  Pl. Mot. at 29.  "Based on the terms of the Solicitation, [Sonoran's] proposal should have been deemed unacceptable and/or its price deemed unrealistic for failing to address these significant requirements in its staffing and price proposals."  Pl. Mot. at 29.

#### b.    The Government's Argument.

The Government responds that:

> Sonoran's choice to [REDACTED] in these areas does not demonstrate that it submitted a non-responsive bid or that it failed to understand the requirements of the solicitation. To the contrary, it demonstrates that Sonoran understands not only the requirements, but also that this is a LPTA competition for a firm fixed-price contract, where the only real way to gain a competitive advantage is through price.

Gov't Mot. at 28.

"The fundamental feature of firm fixed-price contracting is the fact that the contractor assumes all risk of performance within the firm fixed-price."  Gov't Reply at 11 (citing *Afghan*

16

*Am. Army Servs.*, 90 Fed. Cl. at 356 ("[T]he fixed-price task order puts the risk of underpriced offers on the contractor."). "Thus, as a matter of law, Sonoran must perform the requirements of the contract for the firm fixed-price that it proposed, regardless of Sonoran's subjective view of how its pricing breaks out." Gov't Reply at 11. "From a proposal-evaluation perspective, all that matters is that the offerors acknowledge the performance requirements and propose a workable solution." Gov't Reply at 11 (citing *Ceres Env't Servs., Inc.*, 97 Fed. Cl. at 306–07 (determining that an agency may acknowledge some risk associated with lower prices and nevertheless choose, in the exercise of its business judgement, to accept that risk)).

Sonoran addressed every proposed requirement and fully explained how it would provide these services for the prices proposed. Gov't Reply at 11–14. In turn, the Air Force evaluated Sonoran's proposal in detail and reasonably concluded that it met the minimum solicitation requirements. Gov't Reply at 14. "The review by the Air Force technical team was a reasonable exercise of its expertise, and its conclusion should not be disturbed[.]" Gov't Reply at 14.

The Government the addressed the merits of Plaintiff's alleged errors.

### i.  The Five Percent Reteach.

The "reteach" factor was a 5% workload increase over basic coursework and simulator instruction, based on 2014 data showing that approximately 5% of all instruction needed to be repeated. Gov't Mot. at 29 (citing AR Tab 11, at 814–15). Sonoran acknowledged this estimate in its proposal when it stated, "'[REDACTED].'" Gov't Mot. at 29 (quoting AR Tab 15, at 934).

According to the Government, Plaintiff's argument that this demonstrates that Sonoran's proposal failed to include enough hours to cover the entire 5% reteach factor misconstrues the nature of the estimate and the contract. Gov't Mot. at 30. Instead, the PWS stated only that the offeror's were to use estimates as a basis for pricing, but it did not require offerors to tie their pricing strictly to the estimates. Gov't Mot. at 29. Moreover, Sonoran represented that it had the ability to perform the base requirement at a level that would not require as much reteach as was estimated. Gov't Mot. at 29–30. Sonoran's explanation for [REDACTED] factor is reasonable, and the Air Force was reasonable in accepting it. Gov't Mot. at 30.

### ii.  The Fifteen Percent Contract Academic Training Surge.

The Contract Academic Training ("CAT") surge factor is found in Table C1.1 of the PWS that provides:

> Class dates, numbers and student numbers are subject to change, therefore these estimates will be updated as required. In this regard, PFT modifications will normally be accomplished on an annual basis. . . . If actual changes in workload cause more than a 15% change in the total estimated workload, then a negotiated modification to this contract will be accomplished.

AR Tab 11, at 812.

Sonoran expressly acknowledged this provision in its technical proposal:

The Sonoran Team understands additional [REDACTED] of the PWS's level of effort is within the scope of the contract. In our staffing calculations, we use a [REDACTED].

AR Tab 15, at 935.

"ACE[] chose to submit a price that [REDACTED]. Sonoran chose to accept [REDACTED]." Gov't Mot. at 31. Thus, the Air Force acted reasonably in accepting Sonoran's proposal. Gov't Mot at 31.

iii.   **The Ten Percent Courseware Development Surge, The Generation Of Mission Simulator Training Package Events, And The Annual Switch Action Training.**

The pricing "failures" involving the ten percent Courseware Development ("CWD") surge, the generation of Mission Simulator Training Package ("MSTP") events, and the annual switch action training are "instances where Sonoran either accepted all the financial risk of a contingency or agreed to provide a small item *gratis*." Gov't Mot. at 32.

Sonoran acknowledged the requirements of the PWS, expressed its confidence in its ability to handle contingencies, and pledged to provide the annual training at [REDACTED]:

[REDACTED].

AR Tab 15, at 1000.

The Government contends that Plaintiff elected not to [REDACTED] in relation to any of the "surge" requirements. Gov't Mot. at 33. "Sonoran expressed confidence in its staff and chose to accept all of the risk. Each decision is legitimate and reasonable—but the Air Force also acted reasonably when it did not exclude Sonoran, which merely demonstrated the competitive drive that offerors should display in these procurements." Gov't Mot. at 33.

Sonoran also pledged to provide "Annual Switch Training" at [REDACTED]. Gov't Mot. at 33. "The Air Force exercised reasonable judgment when it concluded that Sonoran rationally chose to enhance its competitive position by promising to accomplish this comparatively minimal task [REDACTED] firm fixed-price." Gov't Mot. at 33.

iv.   **Simulator Operation Support.**

Plaintiff's final argument focuses upon how offers should have proposed staffing for the 12,000-hour simulator operations requirement stated in the PWS. Gov't Mot. at 34. "ACE[']s argument proceeds from a fundamental and incorrect assumption: that ACE[']s staffing approach is the only acceptable way to staff this requirement. Of course, the Government determines its requirements, not the offerors." Gov't Mot. at 34.

"ACE[] does not grapple with the technical team's conclusion that the proposals submitted by ACE[] and [REDACTED] vastly overestimated the required staff by applying their own unique additive assumptions." Gov't Mot. at 40. "[T]he Air Force technical team performed a detailed technical review of each offeror's simulator operations staffing, and it concluded that all three offerors not only met the requirements of the PWS, they [REDACTED.]" Gov't Mot. at 41.

### c.    The Court's Resolution.

FAR 16.202-1 provides in relevant part:

A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.  This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss.  It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

48  C.F.R. § 16.202-1.

In this case, the RFP called for a firm fixed-price contract.  AR Tab 28, at 2368.  Sonoran acknowledged all of the requirements of the PWS, decided to accept some financial risk in making its proposal, and explained how it could provide the required services for the prices it proposed.  AR Tab 15, at 934–35, 948–49, 1000.

As the Administrative Record reflects, the Air Force acted reasonably in accepting Sonoran's [REDACTED] reteach proposal, because Sonoran provided that it could perform the base requirement at a level that [REDACTED].  AR Tab 15, at 934; *see also* AR Tab 11, at 812 (PWS Workload Estimates).  The Air Force also acted reasonably in accepting Sonoran's CAT surge proposal, because Sonoran chose to [REDACTED] in applying a reduced [REDACTED] and provided a plausible explanation of how it planned to handle the potential need for a [REDACTED].  *See* AR Tab 15, at 935.

The Air Force also reasonably accepted Sonoran's proposals for the "[REDACTED]."  In its proposal, Sonoran pledged to provide the annual training [REDACTED] and expressed confidence in its ability to handle contingencies.  AR Tab 15, at 1000.  Therefore, the Air Force reasonably acceptance of Sonoran's explanation that "[REDACTED]" of the PWS at a competitive price.  AR Tab 15, at 1000.

The Air Force's decision to accept Sonoran's "Simulator Operation Support" proposal also was reasonable.  Although Plaintiff argues that Sonoran's proposed staffing was too lean, the Air Force's technical team performed a detailed technical review of each offeror's simulator operations staffing and concluded that Sonoran, [REDACTED], and Plaintiff each met the PWS requirements.  AR Tab 31, at 2510 (Sonoran Technical Evaluation); *see also* AR Tab 32, at 2520 (ACE Technical Evaluation); AR Tab 55, at 3618 ([REDACTED] Technical Evaluation).

For these reasons, the court has determined that the Air Force did not materially alter the Solicitation requirements, and its review of Plaintiff's prices was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 4.    Whether The Agency Failed To Notify The Offerors Of The Changed Requirements.

### a.    Plaintiff's Argument.

The PWS imposed extensive requirements, *i.e.*, that the offeror "support 'full mission crew simulator events in three (3) mission E-3 simulators simultaneously using any combination of

Legacy, MTC, or MCTS[] simulators, with a 'mission scenario defined as one four-[h]our block.'"; that "Simulator Operator personnel . . . must be 'available' for the 'up to 16 hours a day, Monday through Friday'"; and that the offeror "support 12,000 hours of 'scenario time per year.'" Pl. Mot. at 41 (quoting AR Tab 11, at 777–78, 789, 816).

But, Sonoran "[REDACTED]," meaning that it "would not have sufficient personnel to provide the 5–8 Simulator Operators per event that the Agency required." Pl. Mot. at 41. As such, the Air Force "abandoned or relaxed its Solicitation requirement" and "prevented all offerors from competing on an equal footing." Pl. Mot. at 42. The same is true of other standards that the Air Force relaxed, *i.e.*, reteach and surge support. Pl. Mot. at 42. "The result was that no one offeror in the competition was competing against the same requirements." Pl. Mot. at 42. Had Plaintiff's proposal been evaluated under the same standards as Sonoran, Plaintiff's price would have been $[REDACTED] lower, making it the lowest-price, technically acceptable offer. Pl. Mot. at 42–43.

**b.      The Government's Response.**

The Government responds that Plaintiff's argument is repetitive of prior arguments and improperly attempts to challenge the terms of the Solicitation in violation of *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a [G]overnment solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."). Gov't Mot. at 42.

As to the first point, "[t]he Government agrees that the FAR 15.206(a) requires [COs] to amend their solicitations when the agency's requirements change. However, the facts must reflect that the requirements actually changed." Gov't Mot. at 42. Plaintiff has failed to demonstrate that the Solicitation requirements changed in any respect. Gov't Mot. at 42.

Also, some of Plaintiff's arguments are untimely, because Plaintiff failed to "obtain clarification by inquiring or filing a protest before it submitted its bid." Gov't Mot. at 42–43 (citing *Bannum, Inc. v. United States*, 779 F.3d 1376, 1380 (Fed. Cir. 2015) ("A bidder that challenges the terms of a solicitation in the Court of Federal Claims generally must demonstrate that it objected to those terms prior to the close of the bidding process."); *see also Blue & Gold*, 492 F.3d at 1315 ("[A] party who has the opportunity to object to the terms of a [G]overnment solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims.")).

**c.      The Court's Resolution.**

The court has determined that the Administrative Record shows that the Government did not "fail to notify" the Plaintiff of the changed requirements.

### 5.   Whether The Government Failed To Engage In Meaningful Discussions With Plaintiff.

#### a.   Plaintiff's Argument.

Plaintiff argues that the Air Force "engaged in exchanges with other technically acceptable offerors," but failed to inform it that the Solicitation's requirements were relaxed and that offerors "were free to exclude certain required tasks or workload without fear of being eliminated as unrealistic." Pl. Mot. at 43. If the Air Force had alerted Plaintiff of these relaxed requirements, Plaintiff's proposed price would have been $[REDACTED], and it would have been the lowest-price, technically acceptable offeror. Pl. Mot. at 44.

#### b.   The Government's Response.

The Government responds that "[l]ike the previous argument, ACE[] incorrectly assumes the truth of its previous arguments concerning the requirements, rather than relying upon the requirements themselves. . . . ACE[] made assumptions about them at its own peril." Gov't Mot. at 43.

The Air Force's correspondence with other offers were clarifications, not changes to the Solicitation. Gov't Mot. at 43–44 (citing 48 C.F.R. § 15.306(a)(1) ("Clarifications are limited exchanges, between the Government and offerors, that may occur when award without discussions is contemplated.")). FAR 15.306 allows offerors "the opportunity 'to resolve minor or clerical errors' without such communications constituting discussions." Gov't Mot. at 44 (quoting 48 C.F.R. § 15.306(a)(2)). The Government explained that it clarified typographical errors with Sonoran and numerical inconsistencies with [REDACTED]. Gov't Mot. at 44. The United States Court of Federal Claims "recognizes that the [CO's] decision to engage in discussions is discretionary, especially when the RFP states—as it does here—that award may be made without discussions." Gov't Mot. at 45 (citing *CliniComp Int'l, Inc. v. United States*, 117 Fed. Cl. 722, 744 (2014) ("The decision whether to conduct discussions is generally left to the discretion of the [CO].")).

#### c.   The Court's Resolution.

The court has determined that the Administrative Record shows that Government did not fail to engage in meaningful discussions with Plaintiff and properly communicated certain clarifications with other offerors, in compliance with FAR 15.306.

### 6.   Whether The Air Force Failed To Reasonably Evaluate Proposed Personnel.

#### a.   Plaintiff's Argument.

Plaintiff argues that the Government violated paragraph 4.9 of the PWS that required the proposed Program Manager/Site Manager to have "[f]ive years['] experience as a project/program manager for a program(s) of the equivalent size and complexity as the E-3 weapons system." Pl. Mot. at 44 (quoting AR Tab 11, at 799). Sonoran and [REDACTED] each proposed Program Managers who did not meet that criteria, but the Air Force nonetheless determined that they

satisfied paragraph 4.9. Pl. Mot. at 44–45. "By failing to evaluate offerors' key personnel against the Solicitation's standard, the [Air Force] arbitrarily deemed [Sonoran] and [REDACTED] technically acceptable." Pl. Mot. at 45. Some of Sonoran's other proposed personnel also "did not satisfy the basic qualifications called for in the PWS." Pl. Mot. at 46.

### b.       The Government's Response.

The Government responds that Plaintiff's argument is a "bare and conclusory assertion [that] leaves the [Government], and the [c]ourt, to guess about the particulars of its objection." Gov't Mot. at 45–46 (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2006) ("We find that these mere statements of disagreement . . . do not amount to a developed argument.")).

Sonoran's proposed program manager had "[REDACTED]," including "Incumbent Training Development Manager for E-3 MCT contract at Tinker Air Force Base.]" AR Tab 15, at 919. Therefore, the Air Force "acted reasonably in concluding that [Sonoran's proposed program manager], who appears to have spent the majority of his [REDACTED] on the E-3 program, and much of it in positions of responsibility, met the minimum qualification stated in the PWS." Gov't Mot. at 49. Likewise, the Air Force reasonably concluded that [REDACTED]'s proposed program manager, who had [REDACTED] with the E-3 program, satisfied the PWS. Gov't Mot. at 49. And, to the extent that any leniency was afforded to Sonoran and [REDACTED], "it was also given to ACE[]," negating any prejudice. Gov't Mot. at 51.

### c.       The Court's Resolution.

Two sections of the Solicitation are relevant here. First, the November 22, 2013 RFP Instructions, in relevant part, provided:

> The purpose of [the technical] section is to allow the offeror to set forth in the most comprehensive manner its understanding of the program requirements and to demonstrate its ability to meet the evaluation requirements of Section 7, Evaluation Criteria; Factor 2, Technical. In this section the offeror shall present a clear and concise description of how it plans to meet contract requirements. The offeror shall describe the performance standards that have been established in each area and explain how performance standards will be met or exceeded. . . .
>
> The offeror shall describe their proposed understanding of the program requirements and demonstrate their ability to meet the evaluation requirement of Aspect 1) Management Approach and Aspect 2) Manning Workload Analysis.

AR Tab 28, at 2416.

Second, the Contractor Qualifications in January 14, 2014 Amendment #2 to the PWS, in relevant part, provides:

> The following qualifications are **required** for the individual employed as Program Manager. . . . 3) Five years experience as project/program manager for a program(s) of the equivalent size and complexity as the E-3 weapons system.

AR Tab 11, at 799 (emphasis in original).

Sonoran proposed [REDACTED], who had "[REDACTED.]"  AR Tab 15, at 919.  Mr. [REDACTED] was the "[REDACTED] for E-3 MCT contract at Tinker [Air Force Base.]"  AR Tab 15, at 919.

Plaintiff proposed [REDACTED], who "[REDACTED.]"  AR Tab 19, at 1203.  Plaintiff's proposal, however, did not specify how many years Mr. [REDACTED] had been the Project Manager.  AR Tab 19, at 1203.

Plaintiff also contends that its proposal met the PWS, *i.e.*, that the Government "had everything it needed to deem ACE[]'s proposed Program Manager/Site Manager technically acceptable."  Pl. Reply at 36.  But, even assuming, *arguendo*, that the Program Manager requirement does not fall within the Government's technical discretion,[12] neither proposal wholly fulfilled the requirement: Sonoran's proposal does not specify that Mr. [REDACTED] was a Project/Program Manager; Plaintiff's proposal never stated that Mr. [REDACTED] had the requisite five years' experience.  AR Tab 15, at 919; *see also* AR Tab 19, at 1203.  As such, Plaintiff suffered no prejudice, because its offer did not meet the PWS requirement.

For this reason, the court has determined that the Air Force reasonably evaluated the proposed personnel.

### 7.    Whether The Plaintiff Is Entitled To Injunctive Relief.

The United States Court of Federal Claims has the authority to issue a preliminary injunction only on notice to the adverse party.  *See* RCFC 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").  The United States Court of Appeals for the Federal Circuit requires the trial court to consider:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).  "No one factor, taken individually, is necessarily dispositive. . . .  [T]he weakness of the showing regarding one factor

_____

[12] The Government argues that:

> These [S]olicitation provisions do not prescribe a specific format for presenting proposed contract personnel; rather, they only require offerors to demonstrate their understanding of the requirements set forth at PWS section 4.9.  This is a standard that gives the agency some latitude in determining, from its own perspective, whether a given offeror's proposal meets the technical criteria.

Gov't Mot. at 47.

But, the court need not decide whether this requirement falls within the Air Force's technical discretion, because even if it did not, Plaintiff's proposal did not meet the requirement.

may be overborne by the strength of others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

The first factor the court must consider is whether "the plaintiff has succeeded on the merits." *PGBA*, 389 F.3d at 1228.  As discussed herein, Plaintiff has not succeeded on the merits. Although one factor can be outweighed by the others, none of the other factors favors Plaintiff. For this reason, the court has determined that Plaintiff is not entitled to injunctive relief

## IV.      CONCLUSION.

For the reasons described herein, Plaintiff's March 6, 2015 Motion For Judgment On The Administrative Record is **denied**.

The Government's April 20, 2015 Cross-Motion For Judgment On The Administrative Record is **granted**.   The Clerk of Court is directed to dismiss Plaintiff's January 26, 2015 Complaint.

**IT IS SO ORDERED.**

/s/ Susan G. Braden
**SUSAN G. BRADEN,**
**Judge.**